Estate of Barbara F. Thompson, Deceased, Forrest G. Thompson, Administrator v. Commissioner.
Thompson v. Commissioner
Docket No. 62664.
United States Tax Court
T.C. Memo 1959-183; 1959 Tax Ct. Memo LEXIS 66; 18 T.C.M. (CCH) 801; T.C.M. (RIA) 59183; September 29, 1959
*66 1. At the time of decedent's death, February 2, 1952, she owned 27 shares of the common stock of the Mushroom Supply Company, a family-held corporation. The estate tax return filed by petitioner included these shares at a valuation of $225 per share. The Commissioner in his determination of a deficiency in estate tax increased this valuation to $535 per share. Held, the value of each share of the stock at decedent's death was $283.50 per share. 2. Respondent's determination included in decedent's gross estate as decedent's interest, certain notes and an undivided one-half interest in a mortgage transferred by decedent in 1947 and 1948 as gifts to her son, an only child, his wife, and their three minor children, grandchildren of decedent. These gifts were made by decedent at a time when she suffered mental illness from hardening of the arteries. The evidence shows, however, that at the time decedent made the gifts in 1947 and 1948, her mind was lucid and she fully understood the nature of the gifts and intended to make them. Held, under the applicable state law, decedent was a competent donor, the transfers were valid gifts inter vivos, and decedent had no interest in these notes *67 and mortgage at the date of her death and the Commissioner erred in including their value as a part of decedent's gross estate under section 811(a), Internal Revenue Code of 1939. 3. Respondent included in decedent's gross estate under section 811(a) and/or (c), I.R.C. 1939, the value of 223 shares of stock in the familyheld corporation, Mushroom Supply Company. He included these shares at a value of $535 per share. Two hundred and twenty-two of these shares had allegedly been transferred by decedent in May 1950 to her three minor grandchildren in consideration of $24,750 promissory notes of Mushroom Supply Company. At the time the alleged transfers were made decedent's mental condition had deteriorated from what it was in 1947 and 1948 when the gifts described in headnote 2 above were made. She was not mentally competent to make the alleged transfers of the 222 shares in question on May 29, 1950. Held, decedent was the legal owner of the 222 shares of stock at the time of her death. She was also the legal owner of 1 share of the Company's stock which had at one time been held in the name of Gene T. Crosley, as a qualifying share. The Commissioner is sustained in including the 223 *68 shares in issue in decedent's gross estate under section 811(a), I.R.C. 1939. Held, further, the Commissioner is not sustained in his determination that the shares should be included at $535 per share; they should be included at a value of $283.50 per share as we have decided as to the 27 shares described in headnote 1. John Van Brunt, Jr., Esq., North American Building, Wilmington, Del., for the petitioner. Stephen P. Cadden, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion BLACK, Judge: The Commissioner has determined a deficiency in estate tax against the estate of Barbara F. Thompson of $46,254.65. The deficiency results from the following adjustments to the net estate as reported on the estate tax return which was filed: For
For
Basic Tax
Additional Tax
Net estate as disclosed by return
($ 30,691.81)
$ 9,308.19
Additions to value of estate: Stocks and bonds
8,370.00
8,370.00
Insurance
196.87
196.87
Jointly owned property
20,000.00
20,000.00
Transfers during decedent's life
156,715.40
156,715.40
Total
$154,590.46
$194,590.46
Deductions from value of estate: Real estate
7,500.00
7,500.00
Net estate corrected
$147,090.46
$187,090.46
Explanation of Adjustments
Stocks and Bonds
Returned
Determined
Item 4 - 27 shares of Mushroom Supply Com-
pany Stock
$ 6,075.00
$ 14,445.00
Increase
8,370.00
The fair market value of the Mushroom Supply Company stock on the date of decedent's
death is $535.00 per share.
*70 Petitioner does not contest the item relating to insurance and only contests part of the adjustment relating to the item of stock and bonds. The petitioner does contest by appropriate assignments of error the remaining adjustments made by the Commissioner in the deficiency notice. For clarity and understanding of the issues involved, the adjustments which are put in issue by the pleadings are as follows: The item described as "Jointly owned property $20,000.00" represents property purchased by decedent and her son Forrest G. Thompson, sometimes hereinafter referred to as Forrest. Petitioner included one-half of this property as jointly owned property and included it at $7,500 for decedent's one-half interest. Respondent in his deficiency notice increased the value of the jointly owned property to $20,000 and included the entire value in decedent's gross estate. The items described in the deficiency notice as "Transfers during decedent's life" consisted of the following transfers of notes, mortgage, and shares of stock of the Mushroom Supply Company: Date of
Property Transferred
Transfer
To Whom Transferred
Value
Assignment of note
6/15/47
Forrest G. Thompson
$ 3,000.00
Assignment of note
6/15/47
Forrest G. Thompson (for Charles
F. Thompson, (a minor)
3,000.00
Assignment of note
6/15/47
Forrest G. Thompson for Phyllis J.
Thompson, a minor)
3,000.00
Assignment of note
9/15/47
Forrest G. Thompson (for Robert
H. Thompson, a minor)
3,000.00
Assignment of mortgage
7/29/47
Lois S. Thompson
38,160.40
Total value of 1947 transfers of notes and mortgage includible in gross estate
of decedent
$ 50,160.40
Approx.
Assignment of note
12/23/48
or
12/24/48
Forrest G. Thompson
$ ,000.00
Assignment of note
12/23/48
or
12/24/48
Charles F. Thompson
3,000.00
Assignment of note
12/23/48
or
12/24/48
Phyllis J. Thompson
3,000.00
Assignment of note
12/23/48
or
12/24/48
Robert H. Thompson
3,000.00
Total value of 1948 transfers of notes includible in gross estate of decedent
$ 12,000.00
Assignment of 1 share of com-
Forrest G. Thompson
$ 535.00
mon stock
9/23/48
Assignment of 74 shares of
Forrest G. Thompson (for Charles
common stock
5/29/50
F. Thompson)
39,590.00
Assignment of 74 shares of
Forrest G. Thompson (for Phyllis
common stock
5/29/50
J. Thompson)
39,590.00
Assignment of 74 shares of
Forrest G. Thompson (for Robert
common stock
5/29/50
H. Thompson)
39,590.00
Total fair market value of 223 shares of common stock of Mushroom Supply
Company at $535.00 per share
$119,305.00
Less $24,750.00 in notes allegedly exchanged for said 223 shares of stock
24,750.00
Value of transfers during decedent's life of 223 shares of common stock in-
cludible in gross estate of decedent
$ 94,555.00
Total increase in decedent's gross estate due to transfers during decedent's
life which are includible in her estate
$156,715.40
*71 The item of $8,370 which the Commissioner added as an increase in the value of stocks and bonds was due to the determination by the Commissioner that the fair market value of 27 shares of Mushroom Supply Company stock concededly owned by decedent at the time of her death had a fair market value of $535 per share, instead of $225 per share reported in the estate tax return. We think it will perhaps contribute to brevity and better understanding to take up each issue separately, make findings of fact upon it, and then decide it before taking up the next issue. A few general findings of fact will be made before we take up the issues separately. General Findings of Fact Barbara Forrest Thompson, hereinafter referred to as decedent, died intestate, a resident of Farnhurst, Delaware, on February 2, 1952. Forrest is decedent's only child, born 1908, and is administrator of her estate. Forrest filed a United States estate tax return for decedent's estate on April 20, 1953, with the director of internal revenue for the Wilmington district, at Wilmington, Delaware. The amount of $451.57 was reported and paid as the net estate tax payable on decedent's estate. Decedent was the widow *72 of Charles H. Thompson, hereinafter sometimes referred to as Charles, who died May 24, 1942, testate. They had been married since about 1905 or 1906 and lived in Wilmington, Delaware. In August 1918, Charles, Forrest, and decedent moved to Chatham, Pennsylvania, and resided there until after the death of Charles. The business which ultimately became known as Mushroom Supply Company, herein sometimes referred to as the Company without regard to form of business organization, was established as a corporation in 1924 at Toughkenamon, Chester County, Pennsylvania, by decedent's husband, Charles, and L. F. Lambert, hereinafter referred to as Lambert. Charles conceived the idea of the business and Lambert and his wife provided the capital to establish an organization to act as a supply house for mushroom growers and a distributor of mushroom spawn produced by Lambert. Lambert and his wife held a majority interest in the Company and Charles an almost equal, but minority interest. Subsequently, about 1930, Charles suffered a nervous breakdown and heart attack. Forrest assumed management of the Company, as well as of the business affairs of both his mother and father with their knowledge *73 and consent. In 1934, the three Thompsons purchased the Lamberts' interests in the Company at a price approximately equal to the par value of the common stock but appreciably less than the book value thereof. Forrest negotiated the purchase of the Lamberts' interests. In 1937, the Company was dissolved as a corporation but the business was continued under the same name as an equal partnership of Charles, decedent, and Forrest. In 1942, Charles died testate, bequeathing his entire estate to decedent, except that he bequeathed one-half of his interest in the Company to Forrest. Subsequently, the Company continued as an equal partnership of decedent and Forrest. From 1942 to 1945, decedent made gifts to Forrest on the dates, of the nature, of the value, and in the total yearly amounts, as follows: Date
Nature of Gift
Value
Yearly Amount
1942
Sept. 10
1/2 interest in mortgage
$3,300
Sept. 11
1/2 interest in land
400
$3,700
1943
Feb. 27
1/2 interest in mortgage
2,000
2,000
1944
Transfer on books of Mushroom Supply Company
3,000
3,000
1945
Transfer on books of Mushroom Supply Company
3,000
3,000
Issue 1 The decedent's estate tax *74 return reported a one-half interest in jointly owned real property at a valuation of $7,500. The Commissioner increased this to $20,000, contending decedent's estate should have reported the full interest in the property at an increased value. Petitioner concedes an increase in value of the property as a whole from $15,000 to $20,000 is correct. Petitioner contends, however, that decedent correctly reported a value of only a one half interest therein. The property was purchased jointly by the decedent and Forrest on July 15, 1942. Title was so held. The decedent furnished one-half the consideration for the purchase of the property and Forrest furnished the other one-half out of his own separate means. Respondent in his brief now says: "Inasmuch as it has been shown that Forrest G. Thompson supplied one-half the consideration, respondent concedes that only one-half the fair market value of the residence, i.e., $10,000.00 should be included in the decedent's gross estate." Therefore, there is no longer anything for us to decide as to Issue 1. In a recomputation under Rule 50 effect should be given to the agreement of the parties on this issue. Issue 2 The decedent's return reported *75 the value of 27 shares of stock in the Company at $225 per share which was the equivalent of the alleged book value of such stock at May 31, 1951, the close of the fiscal year preceding the date of decedent's death. The decedent died on February 2, 1952. The Commissioner adjusted the return to show the fair market value of these securities at the time of decedent's death to be $535 per share. The petitioner now concedes that the estate erred in reporting the value of the stock at $225 per share and concedes that the value of each share of the stock was $283.50 at the time of decedent's death and should be included at that value in a recomputation under Rule 50. Respondent still contends that his determination that each share of the stock had a value of $535 at the time of decedent's death was correct and should be sustained. Findings of Fact With respect to the fair market value of the Company's stock at the time of decedent's death, petitioner introduced considerable oral and documentary evidence. Included in the evidence introduced by petitioner was the testimony of an expert witness on the valuation of property, including the stock of corporations. Based upon the testimony of *76 this witness and upon other evidence in the record, we find that the value of 27 shares of common stock of the Company on February 2, 1952, was $283.50 per share. Opinion As to the 27 shares of the Company's stock involved in Issue 2, there is no dispute that decedent owned them at the time of her death. The only dispute is as to the valuation of these shares on the basic date. The issue arises under section 811(a) and (k), Internal Revenue Code of 1939. [1]
*77 As we have already stated, on this question of valuation petitioner presented considerable evidence, both oral and documentary. Included in this evidence was the testimony of petitioner's expert witness. The witness was the head of the special appraisal section of a nationwide firm of appraisal engineers. This witness had almost 20 years' exerience in appraisals, was a senior member of several national appraisal and engineering societies, had written articles on appraisal, had aided in preparing an appraiser's handbook for the State of Oregon, and had supervised, performed, or testified as to appraisals for at least three agencies of the United States Government. This witness testified extensively as to the factors which he considered in arriving at a fair market value of the stock of the Company. He further testified as to the method he used in arriving at a fair market value. We feel the witness was qualified to appraise the stock, that he did so in a manner reasonably calculated to arrive at a fair market value, and that the method of valuation employed reflected the factors determinative of the value of unlisted securities as set out in the sixth paragraph of section 81.10(c) *78 of Regs. 105, as amended by paragraph 2 of T.D. 5351, 1944 C.B. 579. [2] The effect of the testimony of this witness and other evidence in the record was not alone to destroy the presumption of correctness of respondent's determination, but to establish to our satisfaction, in the absence of rebuttal by respondent, the valuation fixed by the expert witness. We have found, therefore, that the value of the stock of the Mushroom Supply Company on the date of decedent's death was $283.50 per share. That figure should be used in a recomputation under Rule 50. *79 Issue 3 On June 15, 1947, decedent caused four promissory notes of the Company, each in the amount of $3,000, to be transferred to her son, Forrest, and to her three grandchildren, Charles, Phyllis, and Robert. On July 29, 1947, decedent assigned to Lois S. Thompson, her daughter-in-law, a mortgage and bond in the amount of $38,160.40. On December 28, 1948, decedent caused Forrest to make on her behalf four gifts of $3,000 each, represented by promissory notes of the Company, to her daughter-in-law Lois and to her three grandchildren. Respondent has determined that these gifts were null and void in that the decedent was mentally incompetent and incapable of making gifts at the date of the transfers. Petitioner contends that decedent was competent to make the gifts at the time she made them, that they were in fact made, and that they were valid and completed gifts. Findings of Fact The amounts and nature of the property included in these alleged gifts are not in dispute. They have been set out in our preliminary statement relating to the Commissioner's determination of the estate tax and need not be repeated here. In the latter part of 1942, decedent began to show some *80 signs of emotional and mental disturbance. The indications became more pronounced with the passage of time. Forrest became aware that decedent was not well sometime in 1944. In subsequent conversations with Dr. G.W.K. Forrest, decedent's brother, who from time to time treated decedent, Forrest learned that decedent's condition could be expected to reflect slow and gradual deterioration. In 1946 or 1947, adjustments were made in the tax returns of Forrest and/or the Company during an audit by the internal revenue service based upon the disallowance of an equal sharing of the profits of the partnership when decedent did not contribute any effort toward the success of the business. As a result of discussions between Forrest, Dr. Forrest, decedent's sisters, and decedent, and upon the recommendation of Dr. Forrest and decedent's sisters, on April 28, 1947, decedent executed at Wilmington, Delaware, a general power of attorney in favor of Forrest for the management of all of her affairs. At the time of the execution of the power of attorney, decedent understood the nature and effect of the transaction, and was competent so to act. Pursuant to plans laid by decedent and Forrest over *81 a period of time following the death of decedent's husband in 1942, to minimize taxation as much as possible and to retain ownership of the Company within the family, the Company was organized as a corporation under the laws of Pennsylvania on May 19, 1947. The corporation's authorized capital stock was 500 shares of common stock of a par value of $10 per share. On May 22, 1947, decedent executed a document effecting the dissolution of the partnership as of May 27, 1947, between decedent and Forrest and appointing Forrest as her agent in winding up the partnership affairs. On May 31, 1947, the partnership between decedent and Forrest was dissolved and all of the partnership assets were transferred to the corporation. On June 2, 1947, the Company issued stock as follows: 250 shares to Forrest, 249 shares to decedent, and 1 share to Gene T. Crosley. Decedent and Forrest each received from the corporation a one-half interest in a bond and mortgage in the total amount of $76,320.80, or $38,160.40 to each, as well as promissory notes issued to each individually in the amount of $24,750 each. The promissory notes were issued to decedent in denominations of $3,000 each, except one of $750 *82 to make up the $24,750 total to decedent. On June 15, 1947, at the direction of decedent, Forrest, who was president of the corporation, canceled four corporate notes payable to decedent, each of $3,000 denomination, and caused to be issued in the names of himself and each of his three minor children corporate notes of the same denomination. Decedent understood the nature and effect of the transaction and directed Forrest to make it. Forrest kept the notes, both prior and subsequent to the transaction, in the safe of the Company to which he and certain employees had the combination. On June 24, 1947, decedent presented her resignation as a vice president of the Company due to ill health. On July 29, 1947, decedent assigned all her interest in the bond and mortgage issued by the Company to Lois S. Thompson, wife of Forrest. The purpose of the assignment was to effect a gift from decedent to Lois of the value of decedent's interest in the mortgage. The assignment was prepared at decedent's instruction and was signed by decedent at a time when she comprehended the nature of the instrument and understood the nature and effect of the transaction. The assignment was recorded in the *83 Office for Recording of Deeds of Chester County, Pennsylvania, on August 1, 1947. From August 19, 1947, to November 7, 1947, the decedent was a patient at Fairmount Farm Sanitarium, Philadelphia, at which institution she displayed the symptoms of a disturbed senile. There were occasions in this period during which decedent did not manifest such symptoms. On November 7, 1947, decedent was admitted to the Delaware State Hospital, Farnhurst, Delaware, an institution for the mentally sick, upon the certification of two doctors of medicine that she was suffering from a mental or nervous disease. Her condition was diagnosed as psychosis with cerebral arteriosclerosis, or mental illness due to hardening of the arteries of the brain. The effect of decedent's illness was to render her confused most of the time, but she enjoyed lucid intervals during which she could converse rationally, read and comprehend books, magazines and newspapers, discuss, comprehend, and manage her business affairs, and recognize and visit with members of her family, conversing intelligibly with them as to the activities of friends and family. The decedent's condition, however, was such that she could not be cared *84 for at her home without the fulltime services of attendants. On December 23, 1947, decedent signed a gift tax return in her own handwriting for the calendar year 1947, which Forrest had caused to be prepared. The return reported gifts in the form of notes of the Company to Forrest and his children and assignment to Lois of the decedent's interest in a mortgage of the Company, all as hereinbefore described. By five donee's or trustee's information return of gifts (Treasury Department Forms 710) attached to decedent's gift tax return all dated December 31, 1947, Forrest acknowledged receipt of the aforementioned gifts for himself and for his three minor children, and Lois S. Thompson acknowledged receipt of the aforementioned assignments of bond and mortgage. This gift tax return for the year 1947 showed total gifts of $50,160 and, after deductions of five $3,000 exclusions and a specific exemption claimed of $30,000, showed net gifts of $5,160 on which a gift tax of $120.92 was paid. On January 23, 1948, decedent was presented to the staff of Delaware State Hospital, at which time her condition was again diagnosed as psychosis with cerebral arteriosclerosis, an incurable degenerative *85 process capable of improvement to the extent that the patient could socialize with the community. On April 4, 1948, the board of directors of the Company passed a resolution doubling the pension the Company had been paying decedent. The increase was made retroactive to July 1947 and was predicated upon decedent's hospitalization. On September 23, 1948, the share of stock issued to Gene T. Crosley upon the organization of the Company was transferred upon the books of the Company to Forrest. On or about December 23, 1948, decedent discussed with Forrest making additional gifts to her grandchildren and to Lois S. Thompson and directed Forrest to transfer to each of them another $3,000 note of the Company. Decedent understood the nature of the transaction and comprehended its effect. On December 28, 1948, Forrest, having possession of decedent's notes from the Company caused four of them, each of $3,000 face value, to be canceled and four new notes, each of like face value, to be issued in the names of the three minor children of Forrest, and of Lois S. Thompson. Forrest then placed the notes in the safe at the Company's offices. No gift tax return was filed by decedent reporting *86 these four gifts of $3,000 made by her in 1948 because of the provisions in the gift tax law allowing exclusions of $3,000 to the donor of gifts made to donees, without the payment of any gift tax. Opinion The issue here presented is whether respondent erred in including under section 811(a) of the 1939 Code in decedent's estate one-half the value of the mortgage of the Company and the value of a number of the Company's notes which decedent allegedly gave to members of her family during 1947 and 1948. Respondent contended at trial and on brief that decedent was incompetent to make such gifts, and that even if decedent had been competent to make the gifts, she did not make legally completed gifts and did not divest herself of her property in the subject matter of the alleged gifts, and that the inclusion is, therefore, warranted by section 811(a) of the 1939 Code. After a study of the law applicable in the instant case, we have concluded, as was said in Adolph Weil, 31 B.T.A. 899, at 906: "the essential elements of a bona fide gift inter vivos to be (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention *87 on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; * * *" We find all of these elements present in the gifts which decedent made during 1947 and 1948. An eminent and experienced psychiatric practitioner, whose qualifications are beyond doubt, we think, and who attended the decedent, testified that the effect of decedent's disease was to render her confused at times and perfectly lucid at other times. Decedent's son, Forrest, testified that all of the gifts were made at his mother's direction pursuant to a longstanding plan to retain ownership of the family-held Company by transferring it to Forrest, his wife, and his children, and that all actions necessary to be performed by decedent were done only during her *88 lucid intervals when she understood the nature and effect of the transactions and fully discussed them with him. A study of the law of Pennsylvania, the place of completion of the transactions and the situs of the securities and of the mortgaged land, and of the law of Delaware, the domicile of decedent at the time of the transactions and the place of execution of the general power of attorney and of the giving by decedent of directions to Forrest to effect the gifts, convinces us that decedent possessed inter vivos dispositive competence and capacity as well as contractual competence and capacity. Hill v. Baker, 102 A. 2d 923; Poole v. Hudson, 83 A. 2d 703; Poole v. Newark Trust Co., 8 A. 2d 10; Warwick v. Addicks, 157 Atl. 205; Rogers v. Rogers, 66 Atl. 374; 16 Del. C. sections 5120-5124; Union Trust Company of New Castle v. Cwynar, 131 A. 2d 133 (cited to us on brief by respondent); McCown v. Fraser, 192 Atl. 674; 50 Purd. Stat. Ann. sections 1181 and 1182; In re Owen's Estate, 74 A. 2d 705; In re Ryman, 11 A. 2d 677; In re Bryden's Estate, 61 Atl. 250. *89 The donees were either competent themselves to accept the gifts or someone competent acted for them. We sustain petitioner as to Issue 3. We hold that decedent made complete and valid transfers of these notes and the mortgage in 1947 and 1948 and that she owned no interest in them whatever at the time of her death, February 2, 1952, more than 3 years after the gifts were made. It was error for the Commissioner to include them in decedent's estate under section 811(a), 1939 Code. Issue 4 Under date of May 29, 1950, Forrest, allegedly acting for decedent, transferred 222 shares of common stock of the Company for $24,750 worth, at face value, of 6 per cent interest-bearing promissory notes of the Company owned by decedent's grandchildren. The respondent contends that the decedent was incompetent to make such a transfer and, therefore, the alleged transfers were invalid and there must be included in her estate 222 shares of common stock of the Company, less the promissory notes actually transferred to her by Forrest. Alternatively, the respondent contends that if the transaction be recognized, nonetheless, it was a transfer made in contemplation of death, having been made within *90 3 years of death and that the common stock of the Company must be included in the decedent's estate. Respondent has also included in decedent's gross estate one share of stock originally issued in the name of Gene T. Crosley but which was transferred on the stock records of the Company, September 23, 1948, to Forrest and which petitioner contends should not be included in decedent's gross estate. Findings of Fact On May 19, 1950, Forrest caused the notes of his children to be canceled and notes were issued and cash paid to decedent in the amount of $24,500. Three certificates were issued placing 74 shares each in the name of Forrest for the benefit of each of his three minor children. Forrest executed a declaration of trust on May 29, 1950, acknowledging that he held the three certificates in trust for his children. The fair market value of the stock of the Company on May 19, 1950, was $269 per share. Within one week after the transfer of the stock which decedent had held in the Company for the notes of the Company which Forrest held for the children, Forrest caused stock to be purchased for decedent as follows: Food Fair, 200 shares; Christiana Securities, 2 shares. During *91 1949 and 1950, decedent's condition had grown progressively worse. In 1951, decedent suffered a cerebral accident, a stroke, and subsequent to that she never enjoyed any periods of mental lucidity. When the 222 shares of Company stock were transferred by Forrest to each of decedent's grandchildren in blocks of 74 shares, decedent was not mentally competent to make or authorize such transfers. Such transfers were not valid and legal transfers and decedent was the owner of such shares at the time of her death. These 222 shares had a fair market value of $283.50 each at the time of decedent's death. Also the one share of stock transferred to Forrest by Gene T. Crosley in 1948 and which the Commissioner has included in decedent's gross estate had a fair market value of $283.50 at decedent's death. Opinion Petitioner contends that the transaction described in the above findings of fact must be recognized predicated upon the decedent's voluntary understanding of and direction that the transaction take place. Petitioner concedes in the light of the testimony of his own expert witness that the transaction described must be treated as having occurred at less than full exchange value and *92 that, therefore, the difference between the value of $125 per share assigned to the stock for transfer purposes and its full and fair value at the date of transfer must be treated as a gift made concurrently with the transfer. Petitioner concedes that a gift tax return must be prepared and filed disclosing a deficiency in gift tax for the year 1950. Petitioner denies that the transfer was made in contemplation of death, either as a whole or as to that portion of the transfer, which, because of the inadequacy of consideration, must be treated as a gift. Respondent, on his part, contends that when the alleged transfer for a valuable consideration was made on May 29, 1950, by Forrest, purportedly acting for and on behalf of decedent, she was mentally incompetent to make such a transfer and that there was in fact no legal transfer and, therefore, decedent was the owner of the 222 shares of stock at the time of her death. Respondent argues in the alternative that if we should hold that there was a legal transfer of the title of the stock to decedent's grandchildren on May 29, 1950, then we should hold that the transfer was made in contemplation of death and that the value thereof should *93 be included as a part of decedent's gross estate under section 811(c), 1939 Code. We sustain respondent on his first and main contention with respect to this alleged transfer, viz, that decedent was not mentally competent to make it or authorize Forrest to make it at the time it was made, and that, in fact, because of her mental incompetency at that time she made no transfer. There is much testimony in the record concerning decedent's mental condition following her admission to the Delaware State Hospital at Farnhurst. It would, of course, not be practical for us to state or discuss all of this testimony in this opinion but we have carefully considered it in arriving at our conclusion. We are unable to make a finding on the evidence that when the alleged transfers were made, May 29, 1950, by Forrest that decedent was mentally competent to authorize and direct Forrest to make them. The uncontradicted testimony is that decedent was mentally ill with "psychosis with cerebral arteriosclerosis" or, in layman's terms "mental illness due to hardening of the arteries of the brain." The evidence is that her condition grew progressively worse from the time she was admitted to the Delaware *94 State Hospital at Farnhurst until the date of her death which occurred February 2, 1952. The gifts embraced under Issue 3 which were made in 1947 and 1948 were made, as we have found, during periods when decedent was lucid and mentally competent to make them. As we have already said, we are unable to make a finding that she was mentally competent to make the alleged transfers of May 29, 1950. The evidence convinces us that her mental condition had substantially deteriorated since 1947 and 1948 when the gifts in those years were made and that she was not mentally competent to authorize or direct her son Forrest to make the transfers of May 29, 1950. The authorities with respect to a transferor's mental condition at the time transfers are made, cited by us under Issue 3, are applicable here and need not be repeated. We sustain respondent's action in including these 222 shares as part of decedent's gross estate under section 811(a), 1939 Code. We do not sustain respondent as to the valuation of these shares. Respondent has valued them at $535 per share, the same value as he attributed to the 27 shares embraced in Issue 2. For the same reasons as we stated under Issue 2, we think *95 this valuation is too high. We have found that the value of each of these 222 shares at the date of decedent's death was $283.50. That value should be used in a recomputation under Rule 50. Petitioner's expert witness testified that the value of this stock at the time of the aleged transfers, May 29, 1950, was $269 per share. However, that valuation becomes immaterial in view of our holding that the transfers of May 29, 1950, are not to be recognized. Respondent's determination included 223 shares of stock of the Company in decedent's estate and petitioner seems erroneously to have assumed that respondent intended only 222 shares. The one share difference represents the share originally issued to Gene T. Crosley upon the incorporation of the Company in 1947. The share was subsequently transferred to Forrest in September 1948. Respondent contends that this share is includible in decedent's estate under section 811(a) and/or (c), 1939 Code. On the record, we agree with respondent that the share is includible in decedent's estate under section 811(a). Decedent appears to have held the complete beneficial interest in the share in question at the time of incorporation inasmuch as she *96 was the owner of one-half of the partnership. Nothing in the record shows that decedent ever divested herself of that beneficial interest. Absent such proof by petitioner, the respondent's determination as to includibility must stand. As previously discussed, however, the value of the share at the time of decedent's death was $283.50. Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - (a) Decedent's Interest. - To the extent of the interest therein of the decedent at the time of his death; * * *
(k) Valuation of Unlisted Stock and Securities. - In the case of stock and securities of a corporation the value of which by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.↩
2. "If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. Among such other relevant factors to be considered are the values of securities of corporations engaged in the same or a similar line of business which are listed on an exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. Complete financial and other data upon which the valuation is based should be submitted with the return."↩